# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

№ 09 Civ. 3595 (RJS)
_____

NEW YORK CIVIL LIBERTIES UNION,

Plaintiff,

VERSUS

NEW YORK CITY TRANSIT AUTHORITY,

Defendant.

_____

OPINION AND ORDER
December 23, 2009
_____

RICHARD J. SULLIVAN, District Judge:

Plaintiff New York Civil Liberties Union ("Plaintiff" or "NYCLU") brings this action against Defendant New York City Transit Authority ("Defendant" or "NYCTA"), challenging the legality of the policy that governs the public's access to the hearings conducted by New York City's Transit Adjudication Bureau ("TAB"). Members of the public are prohibited from attending these hearings, which adjudicate transit violations for New York City's public transit system, unless the person being accused of a transit violation consents to their attendance. Plaintiff alleges that this public access policy violates its rights under the First and Fourteenth Amendments of the United States Constitution, as well as under federal common law, and asserts these federal claims pursuant to 42 U.S.C. § 1983. Plaintiff also brings state law claims pursuant to "the common law and public policy of the State of New York." (Am. Compl. ¶ 67.)

Before the Court are two motions. Plaintiff has moved for a preliminary

injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, and Defendant has moved for dismissal of Plaintiff's amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court grants Plaintiff's motion for a preliminary injunction on its claims brought pursuant to the First and Fourteenth Amendments and denies Defendant's motion to dismiss.

## I. BACKGROUND

The following facts are taken from Plaintiff's amended complaint, as well as the affidavits and declarations submitted in support of and in opposition to Plaintiff's motion for a preliminary injunction. The relevant facts drawn from these various submissions are largely undisputed, and to the extent factual disputes do exist, their resolution is unnecessary to the disposition of these motions. As such, the Court finds that no evidentiary hearing is necessary to resolve Plaintiff's motion for a preliminary injunction. *See Md. Cas. Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 984 (2d Cir. 1997) ("Generally, the district court is not required to conduct an evidentiary hearing on a motion for a preliminary injunction when essential facts are not in dispute.").

### A. Facts

#### 1. The Parties

Plaintiff NYCLU is a nonprofit corporation the mission of which "is to defend civil rights and civil liberties in New York and to preserve and extend the constitutionally guaranteed rights of those whose rights have historically been denied." (May 29, 2009 Dunn. Decl. ¶ 2.) Defendant

NYCTA is a municipal board and public-benefit corporation established by the laws of New York state. *See* N.Y. Pub. Auth. Law § 1200 *et seq.*[1] In 1984, the New York State Legislature created TAB as part of the NYCTA in order to, *inter alia*, "hear and determine[] charges of transit infractions." *Id.* § 1209-a(4)(1). Although statutorily created in 1984, TAB did not commence adjudication of transit violations until March 1986. (Dewan Decl. ¶ 1.)

The NYCTA operates, maintains, and controls the public mass transportation system in New York City, a system that, as of 2008, consisted of 27 subway lines, 243 bus routes, 6,494 subway cars, and 4,576 buses. (Horan Decl. Ex. 1 at 3.)[2] The system also contains 468 subway stations — the largest number of public transit subway stations of any such system in the world. (*Id.* Ex. 2 at 2.) In 2008, New York City's public transportation system recorded more than 2.3 billion rides, with an average weekday bus and subway ridership of 7.6 million. (*Id.* Ex. 3 at 1.)

---

[1] "Although affiliated with the [Metropolitan Transit Authority, or MTA], the NYCTA is a distinct legal entity with the statutory authority to sue and be sued in its own name." *Morrow v. Metro. Transit Auth.*, No. 08 Civ. 6123 (DLC), 2009 WL 1286208, at *8 n.8 (S.D.N.Y. May 8, 2009) (citing N.Y. Pub. Auth. Law § 1204(1)). "The MTA's functions are limited to financing and planning, while the NYCTA is in charge of operations, maintenance, and control of transportation facilities." *Id.* (citing *Delacruz v. Metro. Transp. Auth.*, 846 N.Y.S.2d 160, 161 (1st Dep't 2007)).

[2] Specifically, the NYCTA is responsible for subway service in the boroughs of Manhattan, Brooklyn, Queens, and the Bronx, and for the operation of the Staten Island Railway in the borough of Staten Island. (*See* Horan Decl. Ex. 1 at 3.) The NYCTA is also responsible for bus service in all five boroughs, as well as the operation of paratransit service throughout New York City, which provides transportation options for people with disabilities. (*See id.*)

2. The NYCTA's "Rules of Conduct"

Passengers using New York's transit system are subject to so-called "Rules of Conduct" ("Rules of Conduct" or the "Rules"), which are promulgated by the NYCTA and are set forth in New York's Official Compilation of Codes, Rules, and Regulations. *See* N.Y. Comp. Codes R. & Regs. tit. 21, § 1050 *et seq.*[3] "These rules [were] established by the [NYCTA] to promote safety, to facilitate the proper use of the transit facilities of the authorities, to protect those transit facilities and their passengers, and to assure the payment of fares and other lawful charges for the use of their systems." *Id.* § 1050.1(b). The Rules of Conduct prohibit, *inter alia*, fare evasion, vandalism, unauthorized commercial activity, carrying liquids in open containers, littering, smoking, gambling, drinking alcohol, carrying weapons or other dangerous instruments, entering restricted areas, and riding on the platform between subway cars. *See id.* § 1050. The Rules of Conduct have existed, in one form or another, since 1966. *See* N.Y. Comp. Codes R. & Regs. tit. 21, § 701 *et seq.* (1966).[4]

3. Enforcement of the Rules of Conduct

Section 1204(5-a) of New York's Public Authorities Law and section 1050.10 of the Rules of Conduct provide that violations of the Rules may be prosecuted in one of two ways — either with summonses returnable to New York City Criminal Court ("New York Criminal Court" or the "Criminal Court"), or notices of violation returnable to hearings conducted by TAB ("TAB Hearings" or the "Hearings"). Each forum provides for a different penalty structure. Specifically, the Rules of Conduct provide that:

> Pursuant to section 1204(5-a) of the Public Authorities Law, any person committing one or more violations of these rules shall be subject to either:
>
> a. criminal prosecution in the criminal court of the City of New York, which court may impose a fine not to exceed twenty-five dollars or a term of imprisonment for not longer than ten days, or both; or
>
> b. civil penalties imposed by the transit adjudication bureau in an amount not to exceed one hundred dollars per violation (exclusive of interest or costs assessed thereon).[5]

---

[3] The creation of such rules is within the statutorily enumerated "[g]eneral powers" of the NYCTA, which include the power "[t]o make, amend and repeal rules governing the conduct and safety of the public as it may deem necessary, convenient or desirable for the use and operation of the transit facilities under its jurisdiction." N.Y. Pub. Auth. Law § 1204(5-a).

[4] Plaintiffs have submitted as part of the record the current version of the NYCTA's Rules of Conduct, as well as the original version of the Rules that was in effect in 1966, and the version of the Rules that was in effect in 1983, shortly before the creation of TAB. (*See* Horan Decl. ¶¶ 16-18; *see also id.* Exs. 4 (current Rules), 5 (1966 Rules), 6 (1983 Rules).) The current version of the Rules is codified in New York's Official Compilation of Codes, Rules, and Regulations, *see*

N.Y. Comp. Codes R. & Regs. tit. 21, § 1050 *et seq.*, and is also available publicly on the official MTA website. (*See* Horan Decl. Ex. 4.)

[5] The Rules further provide that, "[i]n addition to a civil penalty for one or more violations of these rules, an additional penalty, not to exceed fifty dollars, may be imposed upon the failure of a respondent in any proceeding commenced with respect to any such violation to make a timely response to or appearance in

N.Y. Comp. Codes R. & Regs. tit. 21, §
1050.10; *see also* N.Y. Pub. Auth. Law §
1204(5-a).  The Rules also state that a person
who has violated any of the Rules of Conduct
is subject to "ejection from the facilities."
N.Y. Comp. Codes R. & Regs. tit. 21, §
1050.11.

Officers of the Transit Bureau of the New
York City Police Department are responsible
for enforcing the Rules of Conduct.  (*See*
Horan Decl. Ex. 7 at 1 ("Transit Bureau
officers . . . ensur[e] that all persons are
complying both with the usual laws and also
with the separate Rules of Conduct.").)  The
record indicates that although the primary
responsibility for enforcing the Rules may fall
on transit officers, all New York City police
officers are statutorily empowered to enforce
the Rules of Conduct.  *See* N.Y. Comp. Codes
R. & Regs. tit. 21, § 1050.12 ("Any New
York City police officer . . . shall be
empowered to issue a notice of violation for
violation of any of [the Rules of Conduct].")
These officers have the discretion to return
Rules violations either to Criminal Court or
TAB Hearings, and no violation appears to
be, by definition, only returnable to one of the
venues.  (*See* Horan Decl. Ex. 12, Schnabel
Decl. Ex. D (May 13, 2009 Dep. of Martin
Schnabel ("Schnabel Dep. Tr.")) at 26:19-
28:23, 31:6-16.)  The record is silent as to
how officers exercise their discretion in
determining whether to return violations of
the Rules of Conduct to the Criminal Court or
to TAB.[6]

---

connection with a notice of violation or order issued by
the Authority in such proceeding."  N.Y. Comp. Codes
R. & Regs. tit. 21, § 1050.10(b)(2); *see also* N.Y. Pub.
Auth. Law § 1204(5-a).

[6]  At the November 20, 2009 oral argument, counsel for
both parties acknowledged that the record is silent on
this point, and conceded that the answer is irrelevant to

## 4.  The Two Alternate Forums for Enforcement of the Rules of Conduct

### a.  Criminal Court

New York Criminal Court has possessed
jurisdiction over alleged violations of the
Rules of Conduct since the first enactment of
the Rules in 1966.  *See* N.Y. Comp. Codes R.
& Regs. tit. 21, § 702.1 (1966); 1962 N.Y.
Laws ch. 967, § 31(2).  The criminal penalty
for infractions of the Rules of Conduct
remains unchanged since 1966:  "Any
violation of the rules of the New York City
Transit Authority shall be punishable by a fine
not exceeding $25 or by imprisonment for not
longer than 10 days, or both."  N.Y. Comp.
Codes R. & Regs. tit. 21, § 702.1 (1966); (*see
also* Horan Decl. Ex. 5 (the 1966 Rules).)

Members of the public are free to attend
any proceedings held before the Criminal
Court.  *See* N.Y. Judiciary Law § 4 ("The
sittings of every court within this state shall be
public, and every citizen may freely attend the
same . . . .").  This has been the law in New
York since at least 1879.  *See* Gen. Statute of
N.Y. ch. 210, § 5 (1879) ("The sittings of
every court within this State shall be public,
and every citizen may freely attend the same .
. . .").

### b.  TAB Hearings

Under New York law, TAB is not a
"court," but rather a "bureau" located within
the NYCTA.  *See* N.Y. Pub. Auth. Law §
1209-a; (*see also* Schnabel Dep. Tr. at 32:21-
24.)  Notwithstanding this fact, TAB has
possessed concurrent jurisdiction with New
York Criminal Court over alleged violations

---

the issues currently before the Court.  (*See* Nov. 20,
2009 Oral Argument Tr. at 60:4-61:7.)

of the Rules of Conduct since TAB was created by the New York legislature in 1984 and began adjudicating transit infractions in 1986. (Schnabel Dep. Tr. at 26:11-23, 32:5-16; Dewan Decl. ¶ 1); *see also* N.Y. Pub. Auth. Law § 1209-a.

TAB conducts approximately seventy-two hearings per day. (Risi Decl. ¶ 4.) In 2008, TAB conducted over 19,000 in-person hearings, and during the first three months of 2009, there were an average of 1,736 in-person hearings per month. (*See* Horan Decl. ¶ 27; *see also id.* Ex. 15.)

### i.  TAB's Physical Layout

TAB is located at 29 Gallatin Place in Brooklyn, New York. (Horan Decl. ¶ 3; *see also* Schnabel Dep. Tr. at 26:7-8.) TAB's physical layout is set forth in more detail in a declaration submitted by Plaintiff:

> Upon entering the building's front door and proceeding through a hallway, a visitor takes an elevator to the third floor. The elevator opens to an area outside a security checkpoint, where each visitor is required to show identification, have any bags searched, and pass through a metal detector. On the other side of the metal detector is a square waiting area flanked by various service windows and doors, one of which leads to a back area where the TAB has hearing rooms.

(Horan Decl. ¶ 3.) The door leading to the TAB hearing rooms is "locked, and a member of the public is allowed to pass through the door only if it is opened by a TAB official and the person is allowed to enter." (*Id.*) Beyond the locked door "is a hallway that leads to a dozen or so hearing rooms, which have large

windows facing on to the hallway. The interior of each room is clearly visible from the hallway outside the room so a person in the hallway could easily observe what is happening inside the room." (*Id.* ¶ 4.)

### ii.  TAB Hearing Procedures

TAB Hearings are governed by a set of rules promulgated by the NYCTA, which are entitled "Guidelines Governing Proceedings Before the Transit Adjudication Bureau" ("TAB Guidelines" or the "Guidelines"). (*See* Horan Decl. ¶ 24; *see also id.* Ex. 13 (the TAB Guidelines).)[7] The Guidelines establish the procedures that govern the pre-TAB Hearing process, the TAB Hearings themselves, and the post-TAB Hearing process.

### (A)  Pre-TAB Hearing Process

Pursuant to the TAB Guidelines, a person charged with a violation of the Rules of Conduct — who is defined by the Guidelines as a "respondent" (TAB Guidelines § 1.3(k)) — receives a "Notice of Violation and

---

[7] The "Guidelines Governing Proceedings Before the Transit Adjudication Bureau" were promulgated pursuant to the statutory authority contained in section 1209-a(4)(d) of New York's Public Authorities Law, which bestows TAB with the authority:

> To adopt, amend and rescind rules and regulations not inconsistent with any applicable provision of law to carry out the purposes of this section, including but not limited to rules and regulations prescribing the internal procedures and organization of the bureau, the manner and time of entering pleas, the conduct of hearings, and the amount and manner of payment of penalties.

N.Y. Pub. Auth. Law § 1209-a(4)(d).

Hearing" ("NOV"). (*Id.* § 2.1.)[8] Each NOV contains, *inter alia*, a reference to the statute under which the respondent is being charged, a general statement of the Rules of Conduct violation alleged, the details surrounding the occurrence of the alleged violation, the dollar amount of the fine, and the manner, date, time, and place at which the respondent may attend a TAB Hearing to admit or deny the charged violation. (*Id.* §§ 2.1, 2.2.) The Guidelines provide that the NOV "shall be served by personal service." (*Id.* § 2.1.) A respondent so served may either pay the requisite fine or deny the alleged violation. (*Id.* § 2.2.)

If a respondent wishes merely to pay the fine specified in the NOV, he or she may do so either in person or by mail. (*Id.* § 2.2(a).) If a respondent wishes to deny the violation charged, he or she may do so in one of three ways: (1) appearing in person at TAB on the hearing date specified in the NOV and proceeding with the scheduled TAB Hearing; (2) denying the violation charged and requesting an alternate date for a TAB Hearing, which may be done in person, by mail, or by telephone; or (3) denying the alleged violation and requesting to adjudicate by mail. (*Id.* § 2.2(b).)[9] If a respondent

wishes to avail himself or herself of a TAB Hearing, he or she must comply with the procedures set forth in the TAB Guidelines, which provide detailed rules addressing, *inter alia*, the filing of documents (*id.* § 1.4), the proper form of documents (*id.* § 1.5), and the computation of time to comply with the various time periods set forth in the Guidelines (*id.* § 1.6).[10]

Certain rights attach prior to the convening of a TAB Hearing. A respondent is entitled to receive "[n]otice of the hearing date, or rescheduled hearing date, and location shall be given to all parties in a timely fashion prior to the hearing or rescheduled hearing date." (*Id.* § 3.1(b).) Prior to the actual hearing, a respondent may request an adjournment of the scheduled hearing date. (*Id.* § 2.5.) Both the NOV and the respondent's answer (if written) to the NOV may be amended prior to the actual TAB Hearing. (*Id.* § 2.9.) No pre-hearing motions are allowed, however — the Guidelines provide that "[a]ll motions shall be made at the hearing." (*Id.* § 2.3.) There is also no pre-hearing discovery. (*Id.* § 2.8 ("If a [r]espondent seeks to obtain documentary records from the [NYCTA], s/he may request the hearing officer to order the [NYCTA] to produce the records.").)

---

[8] The record indicates that, between 2002 and 2008, there have been between 125,155 and 195,214 NOVs issued each year. (Horan Decl. ¶ 26; *see also id.* Ex. 14.)

[9] If a respondent wishes to adjudicate by mail, the respondent must provide TAB with a "written statement of facts, sworn to before a Notary Public, together with all evidence which s/he wishes to have considered in his/her defense." (TAB Guidelines § 2.2(b)(iii).) By choosing to adjudicate by mail, the respondent "waives his/her right to an in-person hearing." (*Id.*) "However, if the Hearing Officer finds that good cause exists to require that the respondent appear for an in-person hearing, the Hearing Officer may adjourn the matter

and order the [r]espondent to personally appear at TAB." (*Id.*) The record indicates that approximately thirty percent of all "hearings" occur by mail. (Risi Decl. ¶ 3.)

[10] Respondents may appear for a TAB Hearing either "on or before" the return date provided on the NOV. (Risi Decl. ¶ 3.) The return date is either thirty or thirty-one days after the date of the NOV. (*Id.*) A respondent who chooses to avail himself or herself of a TAB Hearing may appear at the TAB building on any business day between 8:30 a.m. and 2:30 p.m. (*Id.*) TAB Hearings are held on a "first-come, first-served basis." (*Id.*)

Failure to respond to the NOV, or failure to appear at the scheduled TAB Hearing, results in an admission of liability, the entry of a "default judgment," and the accumulation of additional penalties beyond the amount stated on the face of the NOV (not to exceed fifty dollars per transit infraction). (*Id.* §§ 1.3(m), 2.1, 2.6, 3.7(a), 4.2.)[11]

(B) TAB Hearings

A respondent may appear at a TAB Hearing "in his/her own behalf, or by a duly authorized representative, including, but not limited to . . . an attorney at law licensed to practice law in the State of New York." (*Id.* § 1.7.) The Guidelines ensure a respondent a "fair and impartial hearing[]" (*id.* § 3.2(b)) and establish the "Rights of Parties" as follows: "Both parties shall have the right of due notice, cross-examination, presentation of evidence, objection, motion, argument, and all other rights essential to a fair hearing and consistent with the requisites of due process." (*Id.* § 3.1(c).) Such rights are set forth in more detail in section 3.1(d) of the Guidelines, which also enumerates the proper "order" of TAB Hearings. (*See id.* § 3.1(d).) In short, TAB Hearings proceed as follows:

(1) Identification of the Hearing Officer;

(2) Recitation of the essential details pertaining to the alleged violation of the Rules of Conduct;

(3) Identification of parties and representatives in the hearing room, and the swearing in of the respondent;

(4) Recitation of the fundamental rights of the respondent, which include:

    (a)    Right to a hearing,

    (b)    Right to be represented by an attorney or other representative,

    (c)    Right to cross-examine the issuing police officer,

    (d)    Right to produce documents and witnesses, and

    (e)    Right to appeal;

(5) Presentation and argument on any motions;

(6) Case in chief against respondent;

(7) Respondent's case in chief;

(8) Rebuttal against respondent;

(9) Reservation of decision by the Hearing Officer.

(*Id.*)

The Hearing Officers who preside over TAB Hearings are appointed by the President of the NYCTA. (*Id.* § 3.2(a).) Hearing Officers must be "admitted to the practice of law in the courts of the State of New York for a minimum of three years" and are compensated on a *per diem* basis. (*Id.*) The Guidelines guarantee the "[i]ndependence" and neutrality of these officers, stating that "Hearing Officers shall not be subject to the

---

[11]  A default penalty may be avoided, however, by requesting a "stay of entry of/vacate a default judgment." (TAB Guidelines § 3.7(c).) Upon such an application, a Hearing Officer will hold an informal, on-the-record hearing, which is not reviewable within TAB, to determine whether "good cause exists to excuse the default." (*Id.*)

directives of the [NYCTA]" (*id.* § 3.2(d)), and further providing that a Hearing Officer may disqualify himself or herself for, *inter alia*, a "personal or fiduciary relationship with a party, any other conflict of interest, or any circumstance which renders the Hearing Officer unable to make an impartial determination" (*id.* § 3.2(e)). A respondent may also make a motion to disqualify a Hearing Officer under any of these grounds. (*Id.*)

The Guidelines provide that Hearing Officers "shall have all powers necessary" to effectuate the proper disposition of TAB Hearings, which include, "without limitation," the following powers:

(1) To issue subpoenas and to rule upon objections to subpoenas;[12]

(2) To rule upon offers of proof and to receive evidence;

(3) To regulate the course of the hearing and the conduct of the parties and their counsel therein;

(4) To consider and rule upon, as justice may require, all motions;

(5) To examine witnesses;

(6) To make a full record of the proceedings; and

(7) To issue written decisions and orders.

(*Id.* § 3.2(b).)[13]

The burden of proof in TAB Hearings lies with the charging police officer, who must "establish[], by clear and convincing evidence, that the [r]espondent has committed or caused the commission of the Transit Infraction charged in the NOV." (*Id.* § 3.3(a).) "The [r]espondent, however, shall have the burden of establishing, by a fair preponderance of the credible evidence, any affirmative defenses which s/he raises." (*Id.*)

Regarding the presentation of evidence at TAB Hearings, the Guidelines require that "[a]ll persons giving testimony as witnesses at a hearing must be placed under oath or affirmation." (*Id.* § 3.1(g).) Exhibits introduced into evidence must be identified, labeled, and marked in sequential order. (*Id.* § 3.3(e).) The Hearing Officer may take "official notice" of all of the NYCTA's Rules of Conduct, the TAB Guidelines, "and all facts of which judicial notice may be taken." (*Id.* § 3.3(c).) The Guidelines provide, however, that "[t]he Hearing Officer shall not be bound by the rules of evidence in the conduct of the hearing, except to those rules relating to privileged communications." (*Id.* § 3.1(h).) "Relevant, material, and reliable evidence shall be admitted without regard to the technical or formal rules of evidence controlling in the courts of the State of New

---

[12] TAB Hearing Officers have the power to grant or deny a respondent's application for a subpoena. (TAB Guidelines §§ 2.7, 3.2(b).) "In determining an application for a subpoena, the Hearing Officer shall consider the good cause and need therefore balanced against the burden and inconvenience to the person(s) to whom the subpoena is directed." (*Id.* § 2.7(b).) Actual enforcement of the subpoena, however, requires that TAB make an application to a "court of competent jurisdiction." N.Y. Pub. Auth. Law § 1209-a(4)(g).

[13] Hearing Officers also possess the authority to suspend attorneys from participating in a particular TAB Hearing "for good cause," which must be stated on the record. (TAB Guidelines § 3.2(c).)

York." (*Id.* § 3.3(b).) "[T]he Hearing Officer shall have the authority to limit the introduction of irrelevant evidence." (*Id.* § 3.1(c).) "Objections to evidence must be timely stated." (*Id.* § 3.3(d).)

TAB is obligated to make a "complete record of each hearing." (*Id.* § 3.4(b).) The record must include: (1) the NOV and the respondent's answer to the NOV; (2) all notices, correspondences, orders, and the Hearing Officer's final decision, (3) all exhibits that were introduced into evidence, and (4) an audio recorded transcript of the proceeding, which constitutes "the official record of the hearing." (*Id.* §§ 3.4(a), (b).) Under the Guidelines, a respondent possesses the right to obtain a copy of this record. (*Id.* § 3.4(c).)[14]

(C) The Issuance of the Hearing Officer's Decision and the Post-TAB Hearing Process

Decisions are issued by the Hearing Officer "[a]fter due consideration of the evidence and arguments." (*Id.* § 3.5(a).) As previously noted, "[n]o charge may be established except upon proof by clear and convincing evidence. Where the charge has not been established, an order dismissing the charge shall be entered." (*Id.*) "Where a determination is made that a charge has been established, the Hearing Officer shall set the fine in accordance with the schedule of fines established by the [NYCTA] and an appropriate order thereto shall be entered in TAB's records." (*Id.*) "The [r]espondent shall be given notice of entry of such order personally or by certified mail." (*Id.*) Absent

the filing of an appeal, this decision by the Hearing Officer constitutes the final order of TAB. (*Id.*)

Within thirty days of the date of the Hearing Officer's final decision, however, a respondent may appeal to one of the "appeals boards within TAB, each of which shall consist of three or more Hearing Officers." (*Id.* §§ 3.6(a), (b).) "No Hearing Officer may sit on an appeals board considering an appeal from a determination made by such Hearing Officer." (*Id.* § 3.6(a).) "The appeals board shall have the power to review the facts and the law, but shall not consider any evidence which was not presented at the original hearing." (*Id.* § 3.6(c).) "The appeals board shall have the power to affirm, reverse, remand, dismiss, or modify any decision and order appealed from for errors of law or fact." (*Id.*) "[T]he decision of the appeals board shall be the final order of TAB. There shall be no further review within TAB." (*Id.* § 3.6(g).) After the decision by an appeals board is issued, a respondent may obtain judicial review of the appeals board's decision pursuant to Article 78 of New York's Civil Practice Law and Rules. (*Id.* § 3.6(i).)[15]

Provided that a final decision has been issued and no appeal within TAB or Article 78 proceeding is pending, TAB possesses "the power to enforce its final decisions and orders

---

[14] The Guidelines guarantee that TAB will retain these records "for a period not less than four (4) months from the date of a final determination." (TAB Guidelines § 3.4(d).)

[15] An Article 78 proceeding provides a mechanism to challenge a decision of a state administrative agency in a New York state court. In such a proceeding, the state court can order that the administrative agency conduct a new hearing if the state court finds, *inter alia*, that the administrative agency acted "in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion." N.Y. C.P.L.R. § 7803; *see, e.g.*, *Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 156-57 (2d Cir. 2006); *Campo v. N.Y. City Employees' Ret. Sys.*, 843 F.2d 96, 101 (2d Cir. 1988).

imposing civil fines and default and late penalties for violations of [the Rules of Conduct] as if they were money judgments, without court proceedings." (*Id.* § 3.8(a).) Specifically, "[a]ny final order of TAB imposing a civil fine and/or penalty, whether the adjudication was had by hearing or upon default or otherwise, shall constitute a judgment rendered by TAB which may be entered in the Civil Court of the City of New York or any other place provided for the entry of civil judgments within the state." (*Id.*) Before a judgment based upon a default may be entered, however, TAB must attempt to notify the respondent of, *inter alia*, the default decision and the dollar amount of the fine imposed. (*Id.* § 3.8(b).)

### iii. TAB Hearings' Public Access Policy

The public access policy governing admission to TAB Hearings is not set forth in any statute. Rather, the access policy is set forth in a document entitled "Procedures for Accessing the TAB Facility and Admission to Hearing Rooms on the Part of Visitors" ("TAB Access Procedures" or the "Procedures"). (*See* Horan Decl. ¶ 28; *see also id.* Ex. 16 (the Tab Access Procedures).) Although the actual TAB Access Procedures document was created "fairly recent[ly]," the underlying access policy has "been in place essentially since TAB's inception." (Schnabel Dep. Tr. at 50:1-19.)[16] The TAB Access Procedures document constitutes "the first written iteration of TAB's public access policy." (*Id.* at 52:5-8.) The document

explains that "[h]istorically, [there] has been no significant interest expressed by either the press or the public in observing [TAB Hearings]. Recently, however, it has been reported that one or more individual[s] encountered difficulty when asking to observe a hearing. In light of these reports, a decision has been made to clarify these procedures through the issuance of a formal written policy." (Horan Decl. Ex. 16.)[17]

The TAB Access Procedures document states that "TAB procedures have permitted members of the press and public to observe TAB adjudicatory hearings except where the respondent objects." (*Id.*) More specifically, under TAB's access policy:

> Members of the press or public desiring to observe a hearing will . . . be asked to wait in the reception area until their number is called. When the next available case is called, the observer's number will also b[e] called. The assigned hearing officer will be advised by the . . . staff in the reception area that someone has requested to observe a hearing.

---

[16] Plaintiff asserts that the Procedures document was not put into writing until March 31, 2009. (*See* Pl.'s Mem. at 5.) This representation is apparently based on the fact that Plaintiff received the TAB Procedures document as an attachment to a letter sent by NYCTA General Counsel Martin Schnabel to the NYCLU on March 31, 2009. (*See* Horan Decl. ¶ 28.)

[17] It appears that the creation of the "Procedures for Accessing the TAB Facility and Admission to Hearing Rooms on the Part of Visitors" document was prompted, at least in part, by "conversations and communications with [Plaintiff's counsel] and other representatives of [his] office . . . [suggesting] that there was not a uniform[] understanding among . . . TAB's employees and representatives as to exactly what the policy was." (Schnabel Dep. Tr. at 52:11-20.) Neither the board of the NYCTA nor the MTA played any role in adopting this access policy. (*Id.* at 57:23-58:5.) The record indicates that this access policy was formulated by several people within the NYCTA, including NYCTA's then-general counsel and legal director. (*Id.* at 57:1-22.)

At the security door to the hearing area, the hearing officer will call the name of the respondent and the number of the observer and will meet them both at the security door. Before they enter the secured area, the hearing officer will ask the respondent in the presence of the member of the press or public whether the respondent would have any objection to having the observer in the hearing room. If the respondent objects, the observer will not be allowed into that particular hearing. If the respondent has no objection, they will proceed with the hearing.

(*Id.*)[18] Under this public access policy (which the Court will occasionally refer to as a "respondent controls" policy), "so long as the respondent consents, that is the end of the inquiry . . . . TAB does not . . . mak[e] a separate determination about the appropriateness of the person observing the hearing." (Schnabel Dep. Tr. at 53:17-23.) Conversely, "if the respondent objects, that is the end of the inquiry[,] and TAB will bar the third party from observing the hearing . . . . [Under this policy,] the respondent simply needs to indicate his or her objection, and is not asked for any particular reason." (*Id.* at 53:24-54:13.)

The justification for this policy was set forth by Martin Schnabel, general counsel for the NYCTA, during his May 13, 2009 deposition:

---

[18] "In those instances where more than one person requests to observe a hearing or there are otherwise space limitations precluding any observers, then, to the extent feasible, the hearing will be held in a conference room or other room large enough to accommodate the person or persons making the request." (Horan Decl. Ex. 16.)

[M]y justification for the policy, my view of the reason we have the policy, the reason I decided to retain the policy was because of what I perceived to be a reasonable concern that modifying the policy in a manner that allows people to attend regardless of the wishes of the respondent may well have the effect of chilling the appearance of some percentage of respondents.

(*Id.* at 89:11-19.) Debra Siedman Dewan, a "per diem senior hearing officer" for TAB, elaborated on this interest in a sworn declaration submitted by Defendant:

[T]here are many instances in which a respondent may reasonably wish to maintain his or her privacy when testifying in defense to a violation of the [NYCTA's] Rules of Conduct. These may include situations in which a minor respondent has asserted that he or she did not want a parent to know that a[n] [NOV] was issued, situations in which a respondent has asserted that he or she had a mental illness and was not able to understand or appreciate the nature and consequences of his or her actions, situations in which a person asserted that he or she had a medical disease (such as AIDS) and was not able to pay a fine, situations in which a person asserted that he or she had a bowel or urinary problem that was a factor in their commission of a violation, and situations in which a respondent has been on probation or parole.

(Dewan Decl. ¶¶ 1, 2; *see also* Nov. 20, 2009 Oral Argument Tr. at 46:9-17.)

## B. Procedural History

Plaintiff commenced this action by filing its initial complaint on April 8, 2009. (Doc. No. 1.) After Plaintiff notified the Court of its intention to file a motion for a preliminary injunction, the Court scheduled a conference for April 29, 2009 to address Plaintiff's contemplated motion. (Doc. No. 6.) At the April 29, 2009 conference, the Court granted Defendant's request to file a cross-motion to dismiss Plaintiff's complaint, adopted an expedited plan for discovery in regard to Plaintiff's contemplated motion for a preliminary injunction, and set a briefing schedule for both motions. (Doc. No. 9.)

The parties concluded expedited discovery on May 15, 2009. (*Id.*) On May 27, 2009, Plaintiff filed its amended complaint (Doc. No. 15), and on May 29, 2009, Plaintiff filed its motion for a preliminary injunction, accompanied by declarations and a memorandum of law ("Pl.'s Mem.") (Doc. Nos. 16-21, 24).[19] Defendant filed its motion to dismiss Plaintiff's amended complaint, with declarations and a single memorandum of law in support of its motion to dismiss and in opposition to Plaintiff's motion for a preliminary injunction, on June 17, 2009 ("Def.'s Opp'n"). (Doc. Nos. 26-30.) Plaintiff filed a reply memorandum of law in support of its motion for a preliminary injunction on June 25, 2009 ("Pl.'s Reply"), which was accompanied by a declaration. (Doc. Nos. 32-33.) On July 2, 2009, Plaintiff

filed its memorandum of law in opposition to Defendant's motion to dismiss ("Pl.'s Opp'n"). (Doc. No. 34.) Defendant filed its reply memorandum in support of its motion to dismiss on July 9, 2009 ("Def.'s Reply"). (Doc. No. 35.) On November 19, 2009, both Plaintiff and Defendant submitted letters to the Court, each of which contained supplemental authority not contained in the parties' moving papers. The Court heard oral argument on the pending motions on November 20, 2009. (Doc. No. 36.)

## II. LEGAL STANDARDS

### A. Preliminary Injunction

Typically, "[a] party seeking preliminary injunctive relief must establish: (1) either (a) a likelihood of success on the merits of its case or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor, and (2) a likelihood of irreparable harm if the requested relief is denied." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 152-53 (2d Cir. 2007) (emphasis omitted). The first of these requirements is altered, however, when, as here, a party seeks a *mandatory* preliminary injunction, that is, an injunction that alters the status quo by commanding a government defendant to perform a specific act. In such a case, the plaintiff must establish a "clear" or "substantial" likelihood that it will prevail on the merits — in other words, a mere "likelihood" of success on the merits no longer suffices, and the "fair grounds for litigation" prong is no longer available. *See Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 89-90 (2d Cir. 2006); *Union Carbide Agric. Prods. Co. v. Costle*, 632 F.2d 1014, 1018 (2d Cir. 1980); *cf. Clear Channel Outdoor, Inc. v.*

---

[19] By stipulation endorsed by this Court on June 15, 2009, Plaintiff voluntarily dismissed its claims against Dale H. Hemmerdinger and Elliot G. Sander, individual NYCTA officials, pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure. (Doc. No. 25.) Accordingly, only the NYCTA remains as a defendant in this action.

*City of N.Y.*, 608 F. Supp. 2d 477, 492 (S.D.N.Y. 2009). A preliminary injunction is an "extraordinary remedy" that should not be routinely granted. *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79, 80 (2d Cir. 1990). The party seeking the injunction carries the burden of persuasion to demonstrate, "by a clear showing," that the necessary elements are satisfied. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

Thus, in order to prevail on its motion for a preliminary injunction, Plaintiff in this matter must establish by a clear showing that (1) it will suffer irreparable harm if the requested relief is denied, and (2) there is a substantial or clear likelihood that Plaintiff will succeed on the merits of its claims.

## B. Motion to Dismiss

On a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must draw all reasonable inferences in Plaintiff's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998). Nonetheless, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Therefore, this standard "demands more than an unadorned,

the-defendant-unlawfully-harmed-me accusation." *Id.* at 1949.

Ultimately, Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. On the other hand, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Applying this standard, if Plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## III. DISCUSSION

At issue in this case is the legality of Defendant's "respondent controls" access policy. Plaintiff challenges this policy on both federal and state grounds, moving for a preliminary injunction in its favor on both its claims brought pursuant to the First Amendment and on its claims brought pursuant to the common law and public policy of New York state.[20] Defendant moves to

---

[20] Insofar as Plaintiff purports to bring a right of access claim pursuant to federal common law, the Court agrees with Plaintiff's concession that for purposes of the parties' current motions, the federal common law claim is "essentially coextensive" with Plaintiff's claim brought pursuant to the First Amendment. (Pl.'s Opp'n at 11.) Accordingly, the same analysis applies to both claims, and the Court will not separately address Plaintiff's federal common law claim in this Opinion and Order.

dismiss Plaintiff's federal claims, and argues that once the federal claims are dismissed, the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims, resulting in the dismissal of Plaintiff's amended complaint in its entirety.

The Court will first discuss Plaintiff's motion for a preliminary injunction before addressing Defendant's motion to dismiss. For the reasons set forth below, the Court grants Plaintiff's motion for a preliminary injunction as pertains to its First Amendment claim and denies Defendant's motion to dismiss Plaintiff's amended complaint.[21]

## A. Plaintiff's Motion for a Preliminary Injunction

As noted, Plaintiff must demonstrate, by a "clear showing," both irreparable harm and a "substantial" or "clear" likelihood of success on the merits in order to meet its burden on its motion for a preliminary injunction. Before turning to each of these requirements, however, the Court will first address Defendant's standing argument.

### 1. Standing

Defendant argues that the Court may not review the merits of Plaintiff's motion for a preliminary injunction because Plaintiff lacks standing. For the reasons stated below, the Court rejects this argument and finds that Plaintiff has standing to challenge

---

[21] In light of the fact that Plaintiff's motion is granted as to its federal claims, the Court does not address Plaintiff's argument that the motion should also be granted as to its New York state law claims. (*See, e.g.*, Pl.'s Mem. at 10-16; Pl.'s Reply at 7-10.) Defendant's motion to dismiss Plaintiff's state law claims is addressed *infra*, *see* Part III.B.

Defendant's "respondent controls" access policy.

### a. Applicable Law

Article III of the United States Constitution limits the jurisdiction of federal courts to the resolution of "[c]ases" and "[c]ontroversies." U.S. Const. art. III, § 2; *see City of L.A. v. Lyons*, 461 U.S. 95, 101 (1983) ("It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy."). One aspect of this case-or-controversy requirement is that the party invoking the jurisdiction of the federal judiciary establish "standing" to sue. *Raines v. Byrd*, 521 U.S. 811, 818 (1997).

Standing consists of three "irreducible" constitutional elements: (1) an "injury in fact," defined as "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of — the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"; and (3) a showing that it "is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (alterations, citations, and internal quotation marks omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements . . . with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. These requirements apply equally to organizations as to natural persons. *See*

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982).

In addition to these constitutional requirements, the Supreme Court has also articulated "prudential" requirements for standing. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004) (noting that "standing jurisprudence contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, and prudential standing, which embodies judicially self-imposed limits on the exercise of federal jurisdiction" (citations and internal quotation marks omitted)). These prudential limitations include "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen v. Wright*, 468 U.S. 737, 751 (1984).

Although the Supreme Court has "not exhaustively defined the prudential dimensions of the standing doctrine," *Newdow*, 542 U.S. at 12, it is well established that the limitation on raising the rights of a third party does not preclude an organization from establishing standing. Specifically, an organization may establish standing in two ways. *See Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998); *see also Nnebe v. Daus*, No. 06 Civ. 4991 (RJS), 2009 WL 3151809, at *6 (S.D.N.Y. Sept. 30, 2009). First, "[t]here is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Under this rubric of so-called "organizational"

standing, the organization "must meet the same standing test that applies to individuals by showing actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Irish Lesbian & Gay Org.*, 143 F.3d at 649 (alterations, citations, and internal quotation marks omitted). Second, an organization may also assert "associational" standing, that is, standing to bring suit on behalf of its members. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977). Associational standing consists of three requirements: "(a) [the organization's] members would otherwise have standing to sue in their own right; (b) the interests [the organization] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 343.

b. Analysis

Defendant argues that Plaintiff has failed to meet its burden in proving the first of the three standing requirements — the requirement that Plaintiff demonstrate that it has suffered an "injury in fact." (*See* Def.'s Opp'n at 7-10; Def.'s Reply at 4-5.)[22]

Defendant first contends that Plaintiff has failed to allege "specific and concrete *membership* injury." (Def.'s Opp'n at 8 (emphasis in original).) Plaintiff, however, purports to assert only organizational standing, not associational standing (*see* Pl.'s Reply at 1-2 & n.1; *see also* Nov. 20, 2009

_____

[22] Defendant does not argue that Plaintiff has failed to allege adequately causation or redressability (*see* Def.'s Opp'n at 7-10), and the Court finds that Plaintiff has met its burden in demonstrating these two requirements.

Oral Argument Tr. at 14:13-15:5, 38:15-16, 57:18-24), and as noted, an organization "may have standing in its *own right* to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth*, 422 U.S. at 511 (emphasis added); *see also Irish Lesbian & Gay Org.*, 143 F.3d at 649-50. Accordingly, the question becomes whether Plaintiff, as an organization, has met its burden of demonstrating an "injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citations and internal quotation marks omitted).

Although the paradigmatic injury pertains to a financial or property interest, the Supreme Court has also recognized aesthetic and recreational injuries, *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972), as well as informational injuries, *Federal Election Comm'n v. Akins*, 524 U.S. 11, 20-21 (1998) (finding that an inability to obtain a list of donors that would help "evaluate candidates for public office" constitutes an injury in fact). It is therefore uncontroversial to state that an alleged deprivation of First Amendment rights alone may suffice to constitute an injury in fact. *See, e.g.*, *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 101 (2d Cir. 2003) (finding that the plaintiff organizations had "met the threshold for establishing standing for a First Amendment claim"); *cf. Rowe v. Shake*, 196 F.3d 778, 781 (7th Cir. 1999) (finding that the plaintiff is entitled to relief absent a physical injury since "a deprivation of First Amendment rights standing alone is a cognizable injury").

A cognizable interest alone is not sufficient, however. "[I]n ruling on standing,

it is both appropriate and necessary to look to the substantive issues . . . to determine whether there is a logical nexus between the status asserted and the claim sought to be adjudicated." *Flast v. Cohen*, 392 U.S. 83, 102 (1968).   Here, the party alleging a deprivation of First Amendment rights is not an individual, but an organization.  In the First Amendment context, the Second Circuit has emphasized that "[a]n organization, as well as an individual, may suffer from the lost opportunity to express its message." *Irish Lesbian & Gay Org.*, 143 F.3d at 650; *cf. Stauber v. City of N.Y.*, Nos. 03 Civ. 9162, 03 Civ. 9163, 03 Civ. 9164 (RWS), 2004 WL 1593870, at *15 (S.D.N.Y. July 16, 2004) (finding that the plaintiff organization "has sufficiently alleged that its free speech rights would be impaired, and the alleged impairment constitutes injury in fact for standing purposes"); *Nitke v. Ashcroft*, 253 F. Supp. 2d 587, 598 (S.D.N.Y. 2003) (noting that the organization "would have standing to sue on its own behalf because it has proffered objective evidence that it has been deterred from exercising its First Amendment rights"). Plaintiff here is not asserting a lost opportunity to express a message, but rather, a lost opportunity to exercise a right of access by freely attending TAB Hearings.  The Court finds nothing unique about such a First Amendment right of access claim that would alter the analysis that allows organizations to assert standing in the First Amendment context.  Courts have allowed organizations to assert claims not only for abridgment of First Amendment speech rights but also for abridgment of First Amendment associational rights, *see, e.g.*, *New Creation Fellowship of Buffalo v. Town of Cheektowaga, N.Y.*, No. 99 Civ. 460 (LGF), 2004 WL 1498190, at *10 (W.D.N.Y. July 2, 2004) ("That organizations . . . are entitled to assert claims for abridgement of their rights to free speech and

association under the First Amendment is also now well established."), and more pertinently, have also routinely allowed organizations to bring the kind of First Amendment right of access claim asserted by Plaintiff here, *see, e.g.*, *The Hartford Courant Co. v. Pellegrino*, 380 F.3d 83 (2d Cir. 2004) (reviewing an organization's First Amendment right of access claim on the merits); *Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002) (same); *North Jersey Media Group, Inc. v. Ashcroft*, 308 F.3d 198 (3d Cir. 2002) (same). *Cf. Westmoreland v. Columbia Broad. Sys., Inc.*, 752 F.2d 16, 21 (2d Cir. 1984) (noting that the Supreme Court has not "endow[ed] the media with substantive rights qua media"). The Court thus finds that Plaintiff is entitled to assert an *organizational* right under the First Amendment to attend TAB Hearings. An organization, like an individual, may suffer from the lost opportunity to attend certain governmental proceedings.

Defendant's remaining argument posits that the injury that Plaintiff has suffered is too conjectural or hypothetical to constitute an injury in fact. As characterized by Defendant, Plaintiff's asserted injury amounts to "nothing more than that the NYCLU may someday wish to observe a particular TAB [H]earing (of special interest to the NYCLU) — as yet unknown and unidentified — but will not be able to because the respondent . . . objects." (Def.'s Reply at 4.)

It is true that "[i]n the First Amendment context, allegations of a 'subjective chill' of free speech rights will not suffice to satisfy the injury-in-fact requirement. Rather, a plaintiff must demonstrate some specific present or future objective harm that the challenged regulation has inflicted by deterring him from engaging in protected

activity." *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 226 (2d Cir. 2006) (citing *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)). Plaintiff, however, does not merely rely on the "subjective chill" that TAB's "respondent controls" access policy has on its ability to attend TAB Hearings. Rather, Plaintiff has introduced objective evidence that the NYCLU's representatives have been denied access to TAB Hearings in the past (*see* Horan Decl. ¶¶ 9, 10), and that the NYCLU "plan[s] to promptly start monitoring TAB [H]earings if it obtains the preliminary injunction it seeks." (June 25, 2009 Dunn Decl. ¶ 7; *see also* May 29, 2009 Dunn Decl. ¶ 9.) (*See generally* May 29, 2009 Dunn Decl. ¶¶ 2-11; Horan Decl. ¶¶ 3-12; Laplace Decl. ¶¶ 2-6; Am. Compl. ¶¶ 2, 5, 29-34, 41-59.) In short, Plaintiff has established that it wishes to exercise its purported First Amendment right to attend and monitor TAB Hearings, that its attempts to do so have been frustrated in the past, and that its attempts will continue to be frustrated in the future absent judicial relief. The Court finds that, under the extant case law, this suffices to establish injury in fact in the context of seeking injunctive relief.[23]

---

[23] Defendant's November 19, 2009 letter to the Court, *see supra* Part I.B, invoked a line of cases in which the Second Circuit — in the context of a pre-enforcement First Amendment challenge to a statute — has held that a plaintiff "need not demonstrate to a certainty that it will be prosecuted under the statute to show injury, but only that it has 'an *actual and well-founded fear* that the law will be enforced against' it." *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000) (quoting *Va. v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988)) (emphasis added). The case before this Court, of course, does not involve a pre-enforcement challenge to a statute, but rather, an organization's challenge to a right of access policy that has been enforced in the past. Furthermore, while a facial pre-enforcement challenge to a statute necessarily involves a hypothetical interpretation of a statute, as well as a hypothetical scenario in which that

Accordingly, the Court will now turn to the merits of Plaintiff's motion for a preliminary injunction, and assess whether Plaintiff has demonstrated, by the requisite "clear showing," both irreparable harm and a "substantial" or "clear" likelihood of success on the merits.

### 2. Irreparable Harm

### a. Applicable Law

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233-34 (2d Cir. 1999) (citation and internal quotation marks omitted). Because of this, "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Id.* at 234 (citations and internal quotation marks omitted). In order to demonstrate irreparable harm, a plaintiff must show an injury that is both "actual and imminent" and "cannot be remedied by an award of monetary damages." *Shapiro v. Cadman Towers Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) (citation and internal quotation marks omitted); *accord Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) ("Where there is an adequate remedy at law, such as an award of money damages, injunctions are

_____

interpretation will be enforced, in this case, there is no question what TAB's access policy is, how that policy will be interpreted, or how that policy will be enforced. As such, to the extent that this line of cases applies, the Court would easily conclude that Plaintiff's fear that it will be denied access to TAB Hearings is certainly "actual and well-founded," given that it intends to monitor TAB Hearings and that, under TAB's undisputed "respondent controls" policy, its right of access to those hearings depends entirely upon the inherently unpredictable say so of future TAB respondents.

unavailable except in extraordinary circumstances."). If the movant fails to make a showing of irreparable harm, the motion for a preliminary injunction must fail. *See Rodriguez*, 175 F.3d at 234 ("In the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied.").

The Supreme Court has long held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *accord Bery v. City of N.Y.*, 97 F.3d 689, 693-94 (2d Cir. 1996). The Second Circuit, however, has "not consistently presumed irreparable harm in cases involving allegations of the abridgement of First Amendment rights." *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003); *cf. Amandola v. Town of Babylon*, 251 F.3d 339, 343 (2d Cir. 2001) (per curiam) (acknowledging that the Second Circuit "has not spoken with a single voice on the issue of whether irreparable harm may be presumed with respect to complaints alleging the abridgement of First Amendment rights"). Clarifying this apparent tension, the Second Circuit has held that (1) "[w]here a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed," but (2) "where a plaintiff alleges injury from a rule or regulation that may only potentially affect speech, the plaintiff must establish a causal link between the injunction sought and the alleged injury, that is, the plaintiff must demonstrate that the injunction will prevent the feared deprivation of free speech rights." *Bronx Household of Faith*, 331 F.3d at 349-50.

18

b.  Analysis

Here, even assuming that Plaintiff's claim falls within the second category in which irreparable harm is not presumed, the Court finds that Plaintiff has established the requisite causal link.   "[T]he alleged deprivation of [Plaintiff's] First Amendment rights results directly from a policy of the [D]efendant."  *Bronx Household of Faith*, 331 F.3d at 350; *cf. Mullins v. City of N.Y.*, 634 F. Supp. 2d 373, 392 (S.D.N.Y. 2009) ("[A] clear causal link exists between defendants' conduct and the deprivation of plaintiffs' First Amendment rights.   The threat . . . is not conjectural.").

As just discussed in the context of constitutional standing, Plaintiff has introduced objective evidence that it has been denied access to TAB Hearings in the past, and that, absent an injunction, it will continue to be denied access in the future.  To the extent that such a denial constitutes a violation of the First Amendment, Plaintiff has satisfied the irreparable harm prong.  *Cf. Clear Channel Outdoor*, 608 F. Supp. 2d at 493 ("If the Court were to find Plaintiffs' First Amendment claims credible, it would necessarily have to find that the Plaintiffs suffered irreparable harm.   The essential inquiry in this dispute is whether those First Amendment claims are convincing."); *Weingarten v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 591 F. Supp. 2d 511, 515 (S.D.N.Y. 2008) ("[P]laintiffs claim that they already have been and, absent an injunction will be, prohibited by the challenged aspects of the Regulation from wearing political campaign buttons and from posting campaign materials.   If and to the extent that this offends their First Amendment rights, they have satisfied the irreparable harm prong."); *Turley v. Giuliani*, 86 F. Supp. 2d 291, 295

(S.D.N.Y. 2000) ("Because the violation of a constitutional right is the irreparable harm asserted here, the two prongs of the preliminary injunction threshold merge into one:   in order to show irreparable injury, plaintiff must show a likelihood of success on the merits.").

The Court thus proceeds to the second prong of the analysis — whether Plaintiff has demonstrated a substantial or clear likelihood of success on the merits of its First Amendment right of access claim.

3.  Substantial Likelihood of Success on the Merits

a.  Applicable Law

The First Amendment, as applied to the states through the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const. amend I.  The Supreme Court has recognized that the First Amendment encapsulates a qualified "right of access" of the press and the public to attend certain governmental proceedings.  In *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980),[24] the Supreme Court first articulated this right, holding that there is a qualified right of access under the First Amendment to attend criminal trials.  *See id.* at 580; *see also Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 603 (1982). The Supreme Court subsequently extended

---

[24]  Chief Justice Burger wrote the plurality opinion in *Richmond Newspapers*, which was joined by Justices White and Stevens.

this right of access to apply to the examination of jurors during voir dire, *see Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984) ("*Press-Enterprise I*"), and to criminal preliminary hearings, *see Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) ("*Press-Enterprise II*").[25]

In *Press-Enterprise II*, the Supreme Court synthesized its previous holdings in this area, creating what has since been labeled the "experience" and "logic" test to determine whether a qualified right of access attaches to a particular proceeding. *See Press-Enterprise II*, 478 U.S. at 8; *cf. Hartford Courant*, 380 F.3d at 92, 94-96 (referring to and applying the "experience" and "logic" test). Specifically, the Supreme Court found that its previous "decisions have emphasized two complementary considerations": first, whether there exists a "tradition" of public access to a type of proceeding that carries "the favorable judgment of experience[]" (the experience prong); second, "whether public

access plays a significant positive role in the functioning of the particular process in question" (the logic prong). *Press-Enterprise II*, 478 U.S. at 8 (citations and internal quotation marks omitted). The Supreme Court recognized that "[t]hese considerations of experience and logic are, of course, related, for history and experience shape the functioning of governmental processes." *Id.* at 9.

In the criminal context, the Second Circuit has found that the First Amendment right of access extends to pre-trial suppression hearings, *see Application of The Herald Co.*, 734 F.2d 93, 99 (2d Cir. 1984), plea hearings and plea agreements filed in connection with those hearings, *see United States v. Haller*, 837 F.2d 84, 86-87 (2d Cir. 1988), and sentencing proceedings, *see United States v. Alcantara*, 396 F.3d 189, 199 (2d Cir. 2005). Although the Supreme Court has not explicitly recognized a First Amendment right of access outside of the criminal context, the Second Circuit has held that the right applies to civil as well as criminal proceedings, *see Westmoreland*, 752 F.2d at 23 (finding that "the First Amendment does secure to the public and to the press a right of access to civil proceedings"), and, applying the experience and logic test, has extended this right to encompass docket sheets of civil proceedings, *see Hartford Courant*, 380 F.3d at 90-96. Other circuits have also concluded that the First Amendment right of access attaches in the civil context. *See Rushford v. New Yorker Magazine*, 846 F.2d 249 (4th Cir. 1988); *Publicker Indus. Inc. v. Cohen*, 733 F.2d 1059 (3d Cir. 1984); *In re Cont'l Ill. Sec. Litig.*, 732 F.2d 1302 (7th Cir. 1984); *Brown & Williamson Tobacco Corp. v. Fed. Trade Comm'n*, 710 F.2d 1165 (6th Cir. 1983); *Newman v. Graddick*, 696 F.2d 796 (11th Cir. 1983).

---

[25]   Although the "right of access" is not explicitly enumerated in the text of the First Amendment, the Supreme Court has emphasized that:

> [W]e have long eschewed any narrow literal conception of the [First] Amendment's terms, for the Framers were concerned with broad principles, and wrote against a background of shared values and practices. The First Amendment is thus broad enough to encompass those rights that, while not unambiguously enumerated in the very terms of the Amendment, are nonetheless necessary to the enjoyment of other First Amendment rights.

*Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982) (citations and internal quotation marks omitted).

The Second Circuit has not yet addressed whether the First Amendment right of access applies in the context of an administrative proceeding.   Both circuits that have been confronted with the issue have held that the right applies to administrative adjudicatory hearings.  *See Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002); *North Jersey Media Group, Inc. v. Ashcroft*, 308 F.3d 198 (3d Cir. 2002).

### b.  Analysis

Plaintiff's claim for a First Amendment right of access to TAB Hearings presents three discrete questions:   first, whether the First Amendment right of access, articulated in the context of criminal proceedings and extended to civil proceedings by the Second Circuit, is properly considered at all in the administrative proceeding at issue in this case; second, if the right does so extend, whether an application of the "experience" and "logic" test results in the attachment of a qualified First Amendment right of access; and third, if so, whether TAB's current "respondent controls" public access policy passes muster under the First Amendment.  The Court will address each of these questions in turn.

### i.  Whether the First Amendment Right of Access Extends to TAB Hearings

The threshold question presented by this case is whether TAB Hearings are simply not subject to First Amendment scrutiny in this context.  Put slightly differently, the question is whether the First Amendment right of access extends beyond the types of proceedings recognized by the Supreme Court and the Second Circuit — that is, formal criminal and civil court proceedings.  The parties, in their respective motion papers and during oral argument, quibble over whether

TAB Hearings are properly labeled a "court," and whether the Hearings should be termed "criminal," "civil," "administrative," or even "quasi-administrative."[26]  The Court finds no need to resolve this debate, because regardless of the label attached, the Court holds that TAB Hearings are not afforded a *per se* immunity from First Amendment scrutiny.

As *Richmond Newspapers* and its progeny make plain, the "right of access" does not stem from the Sixth Amendment's provision for a "speedy and public trial," but rather is enshrined in the guarantees inherent in the First Amendment.  *See Press-Enterprise II*, 478 U.S. at 7 (noting that "the right asserted is not the defendant's Sixth Amendment right to a public trial since the defendant requested a closed preliminary hearing.  Instead, the right asserted here is that of the public under the First Amendment" (emphasis omitted)).[27]  Once unmoored from the Sixth Amendment, there is no principle that limits the First Amendment right of access to any one particular type of "government process."  Indeed, courts have applied the *Richmond*

---

[26]   Plaintiff appears to argue that if the Court labels TAB Hearings "criminal," "the public has a right of access directly under *Richmond Newspapers*, *Press-Enterprise I*, *Press-Enterprise II*, and their criminal-court progeny in the Second Circuit."  (Pl.'s Mem. at 18; *see also* Nov. 20, 2009 Oral Argument Tr. at 27:11-15.)   This argument misconstrues the *Richmond Newspapers* line of cases, which eschews such *per se* formalism in favor of the more nuanced and fact-specific "experience" and "logic" test to determine whether a presumption of openness applies.  *See, e.g.*, *United States v. Alcantara*, 396 F.3d 189, 194-99 (2d Cir. 2005).

[27]   Indeed, the Supreme Court has held that "members of the public have no constitutional right under the Sixth and Fourteenth Amendments to attend criminal trials."  *Gannett Co. v. DePasquale*, 443 U.S. 368, 391 (1979).

21

*Newspapers* analysis in a variety of contexts that span the various branches of the government, such as civil court proceedings, *see Westmoreland*, 752 F.2d at 23, deportation hearings, *see North Jersey Media Group*, 308 F.3d at 208-09, *Detroit Free Press*, 303 F.3d at 695, Article I bankruptcy proceedings, *see Baltimore Sun Co. v. Astri Inv. Mgmt. & Sec. Corp.*, 88 B.R. 730 (Bankr. D. Md. 1988), presidential press conferences, *see Cable News Network Inc. v. Am. Broad. Co.*, 518 F. Supp. 1238 (N.D. Ga. 1981), legislative hearings, *see WJW-TV, Inc. v. City of Cleveland*, 686 F. Supp. 177 (N.D. Ohio 1988), university disciplinary hearings, *see United States v. Miami Univ.*, 294 F.3d 797 (6th Cir. 2002), voter lists, *see Cal-Almond, Inc. v. U.S. Dep't of Agric.*, 960 F.2d 105 (9th Cir. 1992), state municipal planning meetings, *see Whiteland Woods, L.P. v. W. Whiteland*, 193 F.3d 177 (3d Cir. 1999), and administrative hearings conducted by the Mine Safety and Health Administration, *see Soc'y of Prof'l Journalists v. Sec'y of Labor*, 616 F. Supp. 569 (D. Utah 1985).

Such a broad application of *Richmond Newspapers* is consistent with the Supreme Court's articulation of the right of access. In *Globe Newspaper*, for example, the Supreme Court recognized that "'a major purpose of [the First] Amendment [is] to protect the free discussion of governmental affairs' . . . . By offering such protection, the First Amendment serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government." *Globe Newspaper*, 457 U.S. at 604 (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)). Accordingly, the right of access "[a]nalysis is not advanced by rhetorical statements that all information bears upon public issues; what is crucial in individual cases is whether access to a particular government process is important

in terms of that very process." *Richmond Newspapers*, 448 U.S. at 589 (Brennan, J., concurring with the plurality). The *Richmond Newspapers* "experience" and "logic" test was devised to effectuate this analysis, and it is the application of this test, rather than the attachment of a particular label, which determines whether a right of access attaches to a proceeding.

In sum, the Court finds that the reach of the First Amendment is not *ipso facto* determined by the branch of government involved, or the label subsequently attached to a proceeding. This conclusion is in accord with the two circuits to have explicitly considered a similar issue. *See Detroit Free Press*, 303 F.3d at 695 (rejecting "the Government's assertion that a line has been drawn between judicial and administrative proceedings, with the First Amendment guaranteeing access to the former but not the latter"); *North Jersey Media Group*, 308 F.3d at 208-209 (holding that "*Richmond Newspapers* is a test broadly applicable to issues of access to government proceedings"). The Court specifically rejects the contention that TAB Hearings are provided a *per se* immunity from First Amendment scrutiny if they are deemed not to constitute a formal "court," either civil or criminal. As such, the relevant question now becomes whether TAB Hearings should be afforded a presumption of openness under the *Richmond Newspapers* analysis.

### ii. Whether *Richmond Newspapers*' "Experience" and "Logic" Test Results in a Presumptive Right of Public Access

The *Richmond Newspapers* analysis looks to both "experience" and "logic" to determine whether a presumptive public right of access

attaches to a particular hearing.[28]   For the reasons stated below, the Court finds that both "experience" and "logic" dictate that the public has a presumptive right of access to attend TAB Hearings.

### 1. Experience

The "experience" prong inquires into whether there exists a "tradition" of public access to a type of proceeding that carries "the favorable judgment of experience[]." *Press-Enterprise II*, 478 U.S. at 8 (citations and internal quotation marks omitted).   In *Press-Enterprise II*, the Supreme Court clarified that the experience of public access to a particular proceeding need not, by definition, pre-date the creation of the Constitution — the preliminary hearing at issue there lacked any such historical precedent.   *See id.* at 22 (Stevens, J., dissenting) (noting that "it is uncontroverted that a common-law right of access did not inhere in preliminary proceedings at the time the First Amendment was adopted, and that the Framers and ratifiers of that provision could not have intended such proceedings to remain open").   Still, in *Press-Enterprise II*, the Supreme Court emphasized that from the time of Aaron Burr's "celebrated" trial "until the present

day, the near uniform practice of state and federal courts has been to conduct preliminary hearings in open court," and cited a series of twenty-eight state cases in support of that proposition.   *See id.* at 10 & n.3 (majority opinion).

Administrative hearings in general, and TAB Hearings in particular, clearly lack such a historical pedigree.   The Court finds, however, that the lack of a lengthy history is not dispositive of the First Amendment inquiry.   *Cf. United States v. Simone*, 14 F.3d 833, 838 (3d Cir. 1994) (finding a public right of access to a post-trial examination of juror misconduct even though no cited history predated 1980); *United States v. Suarez*, 880 F.2d 626, 631 (2d Cir. 1989) (finding that a qualified First Amendment right of access attaches to Criminal Justice Act forms dating back to 1964 notwithstanding the lack of a "long 'tradition of accessibility'" (quoting *Press-Enterprise II*, 478 U.S. at 10)); *Cable News Network*, 518 F. Supp. at 1244 (finding a First Amendment right of access to presidential press conferences even though the practice had only existed "through several past Administrations").[29]   The "experience"

---

[28]   Neither party has suggested — either in their motion papers or at oral argument — that the *Richmond Newspapers*' "experience" and "logic" test is inappropriate.   On this point, both the Sixth and Third Circuits have concluded that *Richmond Newspapers* furnishes the proper test to determine whether there is a First Amendment right of access in the context of an administrative hearing, although the two courts have reached different conclusions applying that test. *Compare North Jersey Media Group, Inc. v. Ashcroft*, 308 F.3d 198 (3d Cir. 2002) (finding that no right of access attaches to deportation hearings), *with Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002) (finding that a right of access does attach to deportation hearings).

[29]   The Court also takes note of the Supreme Court's decision in *Federal Maritime Commission v. South Carolina State Ports Authority*, 535 U.S. 743 (2002). Holding that state sovereign immunity applies to administrative proceedings, the Supreme Court recognized that "formalized administrative adjudications were all but unheard of in the late 18th century and early 19th century."   *Id.* at 755. Nevertheless, the Supreme Court found that because the administrative hearing at issue "walks, talks, and squawks very much like a lawsuit," state sovereign immunity attached, notwithstanding the administrative label. *Id.* at 757 (citations and internal quotation marks omitted).   While the constitutional issue presented in *Federal Maritime Commission* is clearly distinguishable from this case, the underlying point bears mentioning:   the lack of historical pedigree for administrative hearings does not function as an absolute

prong does not contemplate a requisite number of years in order for a right of access to attach; rather, it inquires into whether "the *place* and *process*" at issue "have historically been open to the press and general public." *Press-Enterprise II*, 478 U.S. at 8 (emphases added).

In this case, the "experience" of TAB Hearings has been, by definition, relatively brief. As set forth above, TAB was created by the New York legislature in 1984 and began adjudicating transit violations in 1986. The current access policy has been in place since the creation of TAB, although the written policy set forth in the document entitled "Procedures for Accessing the TAB Facility and Admission to Hearing Rooms on the Part of Visitors" (*see* Horan Decl. Ex. 16) appears to have been created only recently. (*See* Schnabel Dep. Tr. at 50:1-19.) The document setting forth TAB's access policy notes that "[h]istorically, [there] has been no significant interest expressed by either the press or the public in observing [TAB Hearings]." (Horan Decl. Ex. 16.) The record supports this statement, as NYCTA's general counsel testified that "[t]he number of instances in which anybody has sought to avail themselves of [TAB's access policy] during TAB's existence . . . are [sic] exceedingly few." (Schnabel Dep. Tr. at 50:20-23; *see also* Def.'s Opp'n at 5 ("Since

TAB began operating in 1986, instances in which members of the public (including the press) have sought to observe in-person TAB [H]earings as strangers to those proceedings have been extremely rare." (emphasis and citations omitted); Nov. 20, 2009 Oral Argument Tr. at 40:16-17 ("[T]hese issues have come up very very rarely over the last 23 years.").) Indeed, the record suggests that so infrequently did a member of the public seek to attend a TAB Hearing that, until the advent of this litigation, "there was not a uniform[] understanding among . . . TAB's employees and representatives as to exactly what [TAB's public access] policy was." (Schnabel Dep. Tr. at 52:17-20.) Notwithstanding this lack of uniform understanding among TAB's employees, Defendant itself, in its moving papers, characterizes the policy as follows: "TAB [H]earings are presumptively *open to the public* (unless a respondent objects)." (Def.'s Opp'n at 15 (emphasis in original).) The Court agrees with Defendant's characterization, and finds that, in light of the undisputed evidence just catalogued, the experience of TAB Hearings is one of presumptive public access.

Moreover, the Court finds it relevant that between 1966 and 1986, the Rules of Conduct were *exclusively* returnable to New York Criminal Court — a court that has always provided the public a right of access. And, as noted, violations of the Rules of Conduct *remain* returnable to the publicly accessible Criminal Court today.[30] Thus, not only is the

---

bar to the attachment of constitutional protections. *See Butz v. Economou*, 438 U.S. 478 (1978) (finding that similarities between judicial and administrative proceedings justified the extension of absolute immunity to administrative law judges); *Hannah v. Larche*, 363 U.S. 420, 442 (1960) ("When governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process.").

---

[30] Whether a violation is returned to the Criminal Court or to TAB appears to be at the unfettered discretion of the charging officer. As noted *supra*, *see* Part I.A.3, the record is silent as to how police officers exercise this discretion. The only discernable difference between the two forums is the penalty that may attach — prosecution in New York Criminal Court may result in a fine not greater than $25, or a term of imprisonment

experience of TAB Hearings one of *presumptive* public access, but the experience of the enforcement of the Rules of Conduct is, at least for the most part, one of *actual* public access. While the experience of the public's access to TAB Hearings is by no means as storied as the public's access to criminal or even civil trials, the Court finds that the relevant history, especially when considered in tandem with *Richmond Newspapers*' logic prong, supports a finding that a qualified right of access attaches to these proceedings.

2. Logic

As articulated by the Supreme Court in *Press-Enterprise II*, the "logic" prong asks "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise II*, 478 U.S. at 8. In assessing this prong, courts generally weigh three considerations: whether public access to a particular proceeding will (1) promote the actual adjudicative function of the proceeding; (2) improve the public's perception of and reaction to such proceedings; and (3) enhance democracy in general by allowing for the public to participate in the free discussion of governmental affairs.

For instance, in *Richmond Newspapers*, the plurality found that openness in criminal trials "gave assurance that the proceedings were conducted fairly to all concerned, and it discouraged perjury, the misconduct of participants, and decisions based on secret bias or partiality." *Richmond Newspapers*, 448 U.S. at 569. The plurality further noted that openness enhanced "the performance of

all involved," *id.* at 569 n.7, protected judges from "imputations of dishonesty," *id.*, promoted "[the] educat[ion] [of] the public," *id.*, provided "significant community therapeutic value," *id.* at 570, and "'satsif[ied] the appearance of justice,'" *id.* at 572 (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954)). Likewise, in extending the right of access to civil trials, the Second Circuit found that "public access to civil trials 'enhances the quality and safeguards the integrity of the factfinding process,' 'fosters an appearance of fairness,' and heightens 'public respect for the judicial process,' while permitting 'the public to participate in and serve as a check upon the judicial process — an essential component in our structure of self government.'" *Westmoreland*, 752 F.2d at 23 (quoting *Globe Newspaper*, 457 U.S. at 606). The Third Circuit has considered six similar values "typically served by openness":

> (1) promotion of informed discussion of governmental affairs by providing the public with the more complete understanding of the judicial system; (2) promotion of the public perception of fairness which can be achieved only by permitting full public view of the proceedings; (3) providing a significant community therapeutic value as an outlet for community concern, hostility and emotion; (4) serving as a check on corrupt practices by exposing the judicial process to public scrutiny; (5) enhancement of the performance of all involved; and (6) discouragement of perjury.

*North Jersey Media Group*, 308 F.3d at 217 (quoting *Simone*, 14 F.3d at 839 (internal quotation marks omitted)); *see also Publicker*, 733 F.2d at 1069 ("The explanation for and the importance of this public right of access to

---

not longer than ten days, or both, while judgment in a TAB Hearing may result in a fine not greater than $100 per violation, with no possibility of imprisonment.

civil trials is that it is inherent in the nature of our democratic form of government.")[31]

Given the functional and structural similarities between formal civil and criminal trials and TAB Hearings, the Court concludes that public access to TAB Hearings would serve all of the same values noted by the Supreme Court in *Richmond Newspapers* and its progeny in both the Second and Third Circuits. TAB Hearings are, in essence, adjudicative, adversarial, trial-type proceedings. They are initiated by the issuance of an NOV, just as a civil or criminal trial may be initiated by a complaint. The TAB Hearing itself functions much like a civil or criminal trial, presided over by a Hearing Officer whose neutrality and independence is guaranteed, and who is imbued with powers similar to those of a trial judge in the civil or criminal context. The Hearings are governed by detailed rules, *see supra* Part I.A.4.b.ii, which are remarkably similar to the type of rules extant in a criminal or civil trial setting.

These rules address, *inter alia*, the filing of documents (TAB Guidelines § 1.4), the proper form of documents (*id.* § 1.5), the computation of time (*id.* § 1.6), the appearance of counsel and other representatives (*id.* § 1.7), the issuance of subpoenas (*id.* § 2.7), the scheduling of hearings (*id.* § 3.1(b)), the contents of the record (*id.* § 3.4), the issuance of decisions (*id.* § 3.5), the right to appeal (*id.* § 3.6), the entry of default judgment (*id.* § 3.7), and the enforcement of judgments (*id.* § 3.8). While there are certainly dissimilarities between TAB Hearings and formal civil and criminal trials — most prominently, there is no pre-trial discovery, the formal rules of evidence do not apply, and TAB must apply to a state court to enforce subpoenas and judgments that they issue — these differences do not alter the essentially trial-like nature of the TAB proceedings. As detailed, TAB Hearings involve a multi-staged adjudicative process, which begins with the identification of the Hearing Officer and the recitation of the details of the alleged violation, followed by, *inter alia*, presentation and argument on motions, the case against the respondent, the case in favor of the respondent, the respondent's rebuttal, and finally, the Hearing Officer's decision. The case against the respondent must be proved by "clear and convincing evidence," and any affirmative defenses raised by the respondent must be proven by "a fair preponderance of the credible evidence." (*Id.* § 3.3(a).) Throughout these proceedings, parties to a TAB Hearing are guaranteed "the right of due notice, cross-examination, presentation of evidence, objection, motion, argument, and all other rights essential to a fair hearing and

---

[31] Justice Oliver Wendell Holmes captured several of these considerations as early as 1884. *See Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1069 (3d Cir. 1984). Writing as a justice on the Massachusetts Supreme Courts, Holmes noted that:

> It is desirable that the trial of causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed.

*Cowley v. Pulsifer*, 137 Mass. 392, 394 (1884).

consistent with the requisites of due process." (*Id.* § 3.1(c).)[32]

In light of these undisputed facts, the Court finds that TAB Hearings "walk, talk, and squawk" like a trial, *see Fed. Maritime Comm'n v. S. Carolina State Ports Auth.*, 535 U.S. 743, 757 (2002), and as such, the same "logic" that would favor the right of access in the context of a formally styled criminal or civil proceeding applies in equal force in the context of a TAB Hearing, however labeled. *Cf. Press Enterprise-II*, 478 U.S. at 7, 12 (finding that "the First Amendment question cannot be resolved solely on the label we give the event, *i.e.*, 'trial' or otherwise," and holding that the preliminary hearings at issue were "sufficiently like a trial" for a right access to attach).[33] The Court thus holds that

the "logic" prong of the *Richmond Newspapers* analysis soundly supports the attachment of a qualified First Amendment right of access.

* * *

The "considerations of experience and logic are, of course, related, for history and experience shape the functioning of governmental processes." *Press-Enterprise II*, 478 U.S. at 9. Here, this point is especially salient. Whether by design or by accident, TAB Hearings are, in effect, a substitute forum for the enforcement of the NYCTA's Rules of Conduct. The previous (and current alternative) forum for the enforcement of these rules is New York Criminal Court, a forum to which the public has always had access. It is therefore understandable that TAB Hearings have taken the form that they have — adjudicative hearings before a neutral decision-maker that closely resemble the kind of trial a respondent would face in a criminal

---

[32] The Court takes note of the fact that Plaintiff has submitted evidence that other New York City administrative agencies that conduct similar adjudicative adversarial hearings allow such proceedings to be open to the public. These include hearings before (1) New York City's Parking Violations Bureau, which adjudicates allegations of traffic infractions, (2) the Taxi and Limousine Commission, which adjudicates alleged violations of regulations applying to taxi and limousine service, (3) the office of Administrative Trials and Hearings, which conducts hearings for any agency, board, or commission of New York City, and (4) the Environmental Control Board, which hears cases involving violations of New York City's quality of life laws. (*See* Horan Decl. ¶¶ 30-36; *see also id.* Exs. 18-24.)

[33] The Court does not take any position in regard to the Third Circuit's view that the logic inquiry does not simply end at whether "openness plays a 'significant positive role' in that proceeding," but must also "take account of the flip side — the extent to which openness impairs the public good." *North Jersey Media Group, Inc. v. Ashcroft*, 308 F.3d 198, 217 (3d Cir. 2002). The Court does note, however, that such an approach risks conflating the analysis under *Richmond Newspapers* with strict scrutiny analysis, that is, if a right of access

does attach, whether a particular closure is narrowly tailored to serve a higher governmental interest. In any event, Defendant here fails to identify any such way that open TAB Hearings would impair the *public* good. The sole "concern" identified by Defendant is that "modifying the policy in a manner that allows people to attend regardless of the wishes of the respondent may well have the effect of chilling the appearance of some percentage of respondents" (Schnabel Dep. Tr. at 89:15-19) — a concern that, as will be discussed *infra*, fails to justify a blanket "respondent controls" access policy. This case thus bears no resemblance to the situation presented to the Third Circuit in *North Jersey Media Group*, which involved the presentation of "substantial evidence" that a presumptive right of public access to the deportation hearings at issue "would threaten national security." *North Jersey Media Group*, 308 F.3d at 217; *see also id.* at 220 (finding that "we are unable to conclude that openness plays a positive role in special interest deportation hearings at a time when our nation is faced with threats of such profound and unknown dimension").

or civil court. It is also unsurprising that TAB Hearings have been presumptively open to the public pursuant to a seldom invoked "respondent controls" access policy, much like the publicly accessible criminal courts from which TAB Hearings evolved. While there are, of course, myriad types of governmental proceedings to which a right of access would not appropriately attach under *Richmond Newspapers* — meetings of the cabinet, for example, or police interrogations — the Court finds that the related considerations of "experience" and "logic" strongly support the attachment of a qualified right of access in this context. Indeed, there is little doubt that given the history, form, and function of TAB Hearings, such a right of access would serve all of the salutary functions of the First Amendment right of access. Accordingly, for all of the reasons stated above, the Court concludes that a qualified First Amendment right of public access attaches to TAB Hearings.

### iii. Whether TAB's "Respondent Controls" Access Policy is Narrowly Tailored to Serve a Higher Governmental Value

In *Press-Enterprise II*, the Supreme Court found that, even if a presumptive First Amendment right of access attaches under the *Richmond Newspapers* "experience" and "logic" test, the right is a qualified one. Accordingly, proceedings may be closed if "specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Press-Enterprise II*, 478 U.S. at 13-14 (quoting *Press-Enterprise I*, 464 U.S. at 510); *see also Hartford Courant*, 380 F.3d at 96 (noting that the presumption of openness "is rebuttable upon demonstration that suppression is essential to preserve higher values and is

narrowly tailored to serve that interest" (citations and internal quotation marks omitted)). In other words, the denial of public access is subject to strict scrutiny.[34]

Defendant's justification for TAB's current access policy stems from a "concern" "that modifying the policy in a manner that allows people to attend regardless of the wishes of the respondent may well have the effect of chilling the appearance of some percentage of respondents." (Schnabel Dep. Tr. at 89:15-19; *accord* Def.'s Opp'n at 5-6 (noting that the "central justification for that access policy . . . has been to avoid chilling the willingness of respondents to testify in person in their own defense to the [NOVs] they have received").[35] Defendant's general counsel admitted during his deposition that there is no "factual information," "survey" or any other "empirical information" to support Defendant's speculation in regard to this "chilling" effect. (Schnabel Dep. Tr. at 66:7-18; 67:5-25; 68:13-69:23.)

In assessing whether this is a proper governmental interest to justify TAB's "respondent controls" access policy, the Court

---

[34]   The Supreme Court has noted that, "[o]f course, limitations on the right of access that resemble 'time, place, and manner' restrictions on protected speech would not be subjected to such strict scrutiny." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607 n.17 (1982) (citing *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 63 n.18 (1976)). TAB's "respondent controls" access policy is clearly not a "time, place, or manner" restriction, and accordingly, strict scrutiny applies.

[35]   During Oral Argument, counsel for Defendant elaborated on this interest, asserting that such a chilling effect would result in respondents defaulting on NOVs, and representing, curiously, that the NYCTA wants to prevent such defaults and thereby "encourage people not to pay us fines." (Nov. 20, 2009 Oral Argument Tr. at 41:1-12, 55:1-3.)

28

compares Defendant's asserted interest to the interest articulated by the state in *Globe Newspaper*. That case involved a judge who, pursuant to a state statute, closed a courtroom during the testimony of three minor rape victims. *Globe Newspaper*, 457 U.S. at 598-602. The closure rule was justified as a means to support "the protection of minor victims of sex crimes from further trauma and embarrassment; and the encouragement of such victims to come forward and testify in a truthful and credible manner." *Id.* at 607. In regard to the second of these interests — similar to the interest that Defendant invokes in this matter — the Supreme Court found "the claim speculative in empirical terms," since the state had "offered no empirical support for the claim that the rule of automatic closure contained in [the state statute] will lead to an increase in the number of minor sex victims coming forward and cooperating with state authorities." *Id.* at 609-10. The Supreme Court also found that, "as compelling as [the state's] interest is, it does not justify a mandatory closure rule, for it is clear that the circumstances of the particular case may affect the significance of the interest." *Id.* at 607-08 (emphasis omitted). The Supreme Court thus concluded that "[a] trial court can determine on a case-by-case basis whether closure is necessary to protect the welfare of a minor victim." *Id.* at 608.

Given this precedent, the Court has little trouble holding that, as a matter of law, Defendant's speculation about the likelihood that a respondent will be chilled from attending his or her own TAB Hearing fails to justify Defendant's blanket "respondent controls" public access policy. In *Globe Newspaper*, the Supreme Court found that a mandatory closure policy was unjustified by the state's speculative empirical assumptions, notwithstanding the state's weighty interests

pertaining to minor victims of sexual crimes. Defendant's speculation here — in regard to a much less compelling governmental interest — is likewise insufficient. In both cases, the unwavering access policy fails to take into account the fact that "the circumstances of the particular case may affect the significance of the interest." *Id.* at 607-08. Furthermore, while it is true that under TAB's current policy respondents may object due to some privacy or chilling concern, it is also true that respondents may object for any reason at all, and the undisputed evidence in the record indicates that the respondent is not asked to explain the reason for his or her objection. (Schnabel Dep. Tr. at 53:24-54:13.) For all of these reasons, TAB's "respondent controls" access policy fails to pass muster under strict scrutiny.

The Court notes that it is not entirely unsympathetic to the privacy and chilling concerns identified by Defendant, and it does not doubt that certain respondents would prefer privacy in the adjudication of their disputes, just as certain litigants would prefer the same in the criminal or civil context. Such a desire, however, does not suffice to defeat the First Amendment right of access, and once such a right attaches, it is necessary to make specific, on-the-record findings that closure of a proceeding is narrowly tailored to meet a higher governmental value.[36] If TAB wishes to close any future TAB Hearings at the request of a respondent, the Hearing Officer will be required to make such findings.

---

[36] Such individualized, on-the-record findings — rather than a blanket "respondent controls" access policy — is the proper avenue to address the concerns raised by per diem senior hearing officer Debra Siedman Dewan. (*See* Dewan Decl. ¶¶ 1, 2 (quoted *supra, see* Part I.A.4.b.iii.).)

* * *

For the reasons stated in this Opinion and Order, the Court finds that Plaintiff has met its burden and has demonstrated by a clear showing both irreparable harm and a substantial or clear likelihood of success on the merits as pertains to its claim brought pursuant to the First Amendment.[37]  In sum, the Court finds that Plaintiff has demonstrated that (1) TAB Hearings are not afforded a *per se* immunity from First Amendment scrutiny, (2) under the *Richmond Newspapers*' "experience" and "logic" test, a qualified First Amendment right of access attaches to TAB Hearings, and (3) Defendant's blanket "respondent controls" public access policy is not narrowly tailored to serve an appropriate governmental interest.[38]  Plaintiff's motion for a preliminary injunction is therefore granted as to its First Amendment claim.

## B.  Defendant's Motion to Dismiss

Defendant moves pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Plaintiff's federal claims brought pursuant to the First and Fourteenth Amendments of the United States Constitution.  Defendant argues that once the Court grants this motion and the federal claims are dismissed, the Court should decline to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3).[39]

Defendant's motion to dismiss Plaintiff's federal claims is predicated on two arguments:  that Plaintiff lacks standing as required by Article III of the United States Constitution, and that, as a matter of law, there is no First Amendment right of access to TAB Hearings.  (*See, e.g.*, Def.'s Reply at 4-6.)  The Court has already rejected both of these arguments in connection with granting Plaintiff's motion for a preliminary injunction.  Accordingly, Defendant's motion to dismiss Plaintiff's federal claims is denied, and the motion to dismiss the state law claims pursuant to 28 U.S.C. § 1367(c)(3) is denied as moot.  Defendant's motion to dismiss is therefore denied in its entirety.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff's motion for a preliminary injunction is granted as to its First Amendment claim, and Defendant's motion to dismiss Plaintiff's amended complaint is denied.  The parties shall appear at a status conference before the

---

[37]  As a final matter, the Court concludes that Plaintiff is not required to provide any security pursuant to Rule 65(c) of the Federal Rules of Civil Procedure. There is no evidence in the record to support a finding that Defendant will suffer any monetary damages as a result of this injunction.  Defendant, however, may provide the Court with a renewed application for security pursuant to Rule 65(c) at any time.

[38]  Defendant argues that the Court should also consider the "balance of public interests."  (*See* Def.'s Opp'n at 7, 23-24); *see also Concerned Citizens of Chappaqua v. U.S. Dep't of Transp.*, 579 F. Supp. 2d 427, 432 (S.D.N.Y. 2008) ("[W]hen the preliminary injunction implicates public interests, a court should consider the balance of such public interests when evaluating the private injury.").  Here, for the reasons already stated, the Court finds that the "balance of public interests" supports providing the public with a qualified right of access to TAB Hearings.

[39]  Under 28 U.S.C. § 1367(c)(3), "district courts may decline to exercise supplemental jurisdiction over the other claims if the district court has dismissed all claims over which it has original jurisdiction."  *See Fischer & Mandell LLP v. Citibank, N.A.*, No. 09 Civ. 1160 (RJS), 2009 WL 1767621, at *6 (S.D.N.Y. June 22, 2009).

Court on Wednesday, January 13, 2010 at 4:30 p.m. in Courtroom 21C, United States District Court, 500 Pearl Street, New York, New York.

The Clerk of the Court is instructed to terminate the motions located at docket numbers 16, 21, and 30.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: December 23, 2009
        New York, New York

* * *

Plaintiff New York Civil Liberties Union is represented by Christopher Dunn and Arthur Eisenberg, New York Civil Liberties Union, 125 Broad Street, 19th Floor, New York, New York 10004.   Defendant New York City Transit Authority is represented by Richard Schoolman and Valerie Ferrier, New York City Transit Authority, 130 Livingston Street, Brooklyn, New York 11201.

31